Argued April 4, reversed June 3, 1966

# STATE OF OREGON *v.* FRANZONE
### 415 P. 2d 16

*Julian Herndon, Jr.,* Portland, argued the cause and filed a brief for appellant.

*George M. Joseph,* Deputy District Attorney, Portland, argued the cause for respondent. With him on the brief was George Van Hoomissen, District Attorney, Portland.

Before McALLISTER, Chief Justice, and PERRY, SLOAN, GOODWIN, DENECKE, HOLMAN and LUSK, Justices.

### LUSK, J.

The defendant was indicted for violation of ORS 161.310, generally known as the nuisance statute.[1]

Defendant demurred to the indictment on various grounds and the demurrer was overruled. The parties thereafter entered into a so-called stipulation of facts, which, however, consists only of a repetition of the allegations of the indictment. Trial was had on such stipulation before the court without a jury and the court entered a judgment of conviction from which the defendant appeals.

The indictment alleges:

"FRANK FRANZONE is accused by the Grand Jury of the County of Multnomah and State of Oregon, by this indictment of the crime of COMMITTING AN OFFENSE WHICH OPENLY

---

[1] ORS 161.310:

"If no punishment is expressly prescribed for the act by the criminal statutes, any person who wilfully and wrongfully commits any act which grossly injures the person or property of another, or which grossly disturbs the public peace or health, or which openly outrages the public decency and is injurious to public morals, upon conviction, shall be punished by imprisonment in the county jail for not less than one month nor more than six months, or by fine not less than $50 nor more than $200."

OUTRAGES THE PUBLIC DECENCY committed as follows:

"The said FRANK FRANZONE on or about the 15th day of January, A.D. 1964, and on divers other days and times between that day and the day of presentment of the within indictment in the County of Multnomah, State of Oregon, did unlawfully, wilfully and wrongfully commit a certain act which openly outraged the public decency and was injurious to public morals, in that the said FRANK FRANZONE did obtain money of the United States of America from persons charged with violations of motor vehicle traffic laws and ordinances in courts within the State of Oregon, upon the representation and claim that he, the said FRANK FRANZONE, would obtain dispositions of the aforesaid motor vehicle traffic violation charges favorable to the persons so charged, and such dispositions to be had other than pursuant to the due course of law, and the said FRANK FRANZONE did obtain money of the United States of America from one Robert Wrenn upon the representation and claim that he, the said FRANK FRANZONE, would obtain a disposition favorable to the said Robert Wrenn of a motor vehicle traffic violation charge then pending against the said Robert Wrenn in a court within the State of Oregon, and such disposition to be had other than pursuant to the due course of law, and the said FRANK FRANZONE did obtain money of the United States of America from one Dennis Arant upon the representation and claim that he, the said FRANK FRANZONE, would obtain a disposition favorable to the said Dennis Arant of a motor vehicle traffic violation charge then pending against the said Dennis Arant in a court within the State of Oregon, and such disposition to be had other than pursuant to the due course of law, and the said FRANK FRANZONE did obtain money of the United States of America from one Leonard Tucker upon the representation and claim that he,

the said FRANK FRANZONE, would obtain a disposition favorable to the said Leonard Tucker of a motor vehicle traffic violation charge then pending against the said Leonard Tucker in a court within the State of Oregon, and such disposition to be had other than pursuant to the due course of law, contrary to the Statutes in such cases made and provided, and against the peace and dignity of the State of Oregon.

"*   *   *   *   *"

■ Defendant assigns as error the ruling on the demurrer. He contends that ORS 161.310 is unconstitutional—that it is "void for vagueness," and a conviction under it violates the due process clause of the Fourteenth Amendment of the Constitution of the United States.

The nuisance statute has been part of the law of this state since 1864, and, as hereinafter shown, has been applied to various classes of conduct in cases that have come to this court. The statute was attacked for vagueness, though not apparently on constitutional grounds, in *State v. Ayers,* 49 Or 61, 88 P 653, 10 LRA NS 992, 124 Am St Rep 1036. The constitutionality of the statute seems to have been first directly challenged in 1954, in the case of *State v. Elliott,* 204 Or 460, 277 P2d 754, in which we held that the maintenance and operation of an abortion clinic was an offense under the statute and that the statute was constitutional as applied to that case. The court reasoned that, since it had been previously determined in *State v. Atwood,* 54 Or 526, 102 P 295, 104 P 195, 21 Ann Cas 516, that the act charged was covered by the statute, the defendant was sufficiently advised of its illegality. That reasoning, whether valid or not, is, of course, without application to the case at bar. The question was raised again in the brief of the defendant

in *State v. Dewey*, 206 Or 496, 292 P2d 799, another abortion clinic case, but on the oral argument was waived.

We regard the question of the constitutionality of ORS 161.310 as still an open one, particularly in view of recent decisions of the Supreme Court of the United States.[2] But, in obedience to the established rule that courts will not decide constitutional questions if the case can be properly determined on other grounds, we will not now pass on the question of the constitutionality of the statute, for we are of the opinion that the conduct described in the indictment does not fall within its embrace, and the indictment, therefore, does not state a crime.

As we read the indictment, it alleges that the defendant obtained money from three named persons who were charged with violations of the motor vehicle traffic laws and ordinances within this state, on the representation that he would obtain a disposition of their cases favorable to such persons "other than pursuant to the due course of law." Defendant argues that the quoted language is vague and uncertain, but we may assume for present purposes that it is sufficiently definite. It is not alleged that the defendant did obtain such favorable disposition of the cases or that he failed to do so. The gist of the charge seems to be obtaining of money for a promise to accomplish an

---

[2] See Ashton v. Kentucky, 382 US 971, 16 L ed2d 469, 86 S Ct 1407, and cases cited in Footnote 1. The court said:

"Vague laws in any area suffer a constitutional infirmity. When First Amendment rights are involved, we look even more closely lest, under the guise of regulating conduct that is reachable by the police power, freedom of speech or of the press suffer."

The Ashton case involved First Amendment rights; the cases cited in Footnote 1 involved other areas.

unlawful purpose, i.e., an interference, in some manner not stated, with the orderly administration of justice. As the state's brief puts it: "The gist of the offense charged here is that defendant held himself out as a 'fixer' for a price."

■ The nuisance statute, as this court has frequently said, was intended to cover offenses against the public peace, the public health and the public morals not elsewhere made punishable by the criminal statutes and which were known at common law as indictable nuisances: *State v. Anderson,* 242 Or 457, 410 P2d 230, 232, and cases there cited.

The statute includes three classes of offenses, namely, an act which "grossly injures the person or property of another," an act which "grossly disturbs the public peace or health," and an act which "openly outrages the public decency and is injurious to public morals."

■ In this case we are not concerned with either the first or the second class of conduct. The sole contention of the state is that the defendant, as the indictment alleges, "did unlawfully, wilfully and wrongfully commit a certain act which openly outraged the public decency and was injurious to public morals." It should first be noticed that this clause is in the conjunctive. The act must both openly outrage the public decency and be injurious to public morals: *Allen v. Norton,* 6 Or 344. For the decision of this case it is necessary to determine only what is meant by the former of these elements, that is to say, what are the contours of the prohibition of an act which grossly outrages the public decency?

We have held that the provision applies to the maintenance of an abortion mill: *State v. Dewey; State*

*v. Elliott; State v. Atwood,* all supra; and to an attempt to "frame" the mayor of the City of Portland by getting him in an indecent and compromising situation with a woman in a public place: *State v. Waymire,* 52 Or 281, 97 P 46, 21 LRA NS 56, 132 Am St Rep 699. These are the only cases in which the conduct alleged has been found to openly outrage public decency and to be injurious to public morals.

The opinion in the *Waymire* case, written by Mr. Chief Justice ROBERT S. BEAN, is a definitive exposition of the sort of conduct aimed at by the language under consideration. We, therefore, quote from the opinion at length. After stating that the statute was intended to cover offenses against the public peace, the public health, and the public morals not elsewhere made punishable by the code and which were known at common law as indictable nuisances, the court said:

> "There was a time when it was thought that the subject of morals, public and private, belonged exclusively to the ecclesiastical courts, and therefore but little mention is made in the common-law reports of punishments for offenses *contra bonos mores* until the reign of Charles II, when Sir Charles Sedley was indicted and severly punished for standing naked on a public balcony in the city of London. 1 Keble, 620, 17 Howell's St. Tr. 154. This case was subsequently frequently cited, often doubted, and sometimes followed until *Rex v. Delaval,* 3 Burr. 1438, which was a prosecution for conspiracy to place a young woman in the possession of a man for prostitution, and publicly to exhibit her as a kept mistress, when Lord Mansfield put the question at rest by holding that the common-law courts, being *custos morum* of the people, had jurisdiction of all offenses contrary to good morals and public decency, citing in support of his conclusion the opinion of Lord Hardwicke, who ordered the prosecution of a man for formerly as-

signing his wife to another as 'being grossly against public decency and public morals.' It is, therefore, now settled that acts of public indecency, such as lewdness (Wharton, Criminal Law, 1432), exhibiting obscene pictures (*Commonwealth v. Sharpless,* 2 Serg. & R. [Pa.] 91: 7 Am. Dec. 632), standing naked on a balcony in a public place (1 Keble, 620), conspiring to place a young woman in possession of another for purposes of prostitution (*Rex v. Delaval,* supra), casting a dead body into a river (Kanavan's Case, 1 Greenl. [Me.] 226), the publication of an indecent book (2 Strange, 789), and the like, are indictable and punishable at common law because they outrage public decency and are injurious to good morals." 52 Or at 285-286.

The significance of the word "decency" as used in the statute is also explained in *State v. Nease,* 46 Or 433, 80 P 897, a prosecution for maintaining a place where pools on horse races were sold. The court there said that certain acts were punishable as nuisances at common law because they "outraged public decency and were against good morals," and these included habitual, open and notorious lewdness and the like; other acts were punishable because they injuriously affected the public health, such as maintaining slaughter houses in a populous neighborhood (see *State v. Bergman,* 6 Or 341); while still others "were punishable because they disturbed or injured the public peace or morals, by congregating large numbers of idle and dissolute persons in one place for vicious purposes, and of such were common gaming houses": 46 Or at 440-441.

Dictionary and judicial definitions indicate that the word "decency" was not carelessly selected, but was used to indicate the particular character of misconduct deemed punishable as a nuisance pointed out

in the *Ayers* and *Nease* cases. "Decency" is defined in Webster's New International Dictionary (2d ed) as follows:

> "* * * suitable, or becoming, in words or behavior; propriety of form in social intercourse or in actions; * * * hence, freedom from obscenity or indecorum; modesty."

Its antonym is "indecency," and while, in its widest sense, that word may indicate conduct merely offensive to some general sense of propriety, but free from moral obloquy, this is not the sense in which the phrase "openly outrages the public decency" was used, for the conduct must also be "injurious to public morals." Such conduct is "indecent" in the sense of lewdness or obscenity. When found in criminal statutes the word has often been so construed by the courts. See *Commonwealth v. Buckley,* 200 Mass 346, 352, 86 NE 910, 22 LRA NS 225, 128 Am St Rep 425, and numerous cases digested in 20A Words and Phrases, 521-524.

■ The conduct of the defendant described in the indictment, however reprehensible, was not of the character which the nuisance statute makes a public offense. As the state's brief says, the statute has "never before been applied in an identical or closely analogous situation in this state—or anywhere else, for that matter." Were it to be held properly applicable to this case, almost any dishonest, fraudulent, socially undesirable or knavish conduct, not otherwise denounced as criminal by specific statute, which a judge and jury might deem punishable, would become a crime. The citizen would have no means of knowing what is and what is not forbidden. If the statute were

to be so construed, it is difficult to see how it could withstand constitutional attack.

The judgment is reversed and the bail of the defendant is directed to be exonerated.